UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CARRIE PLATT,                          )
                                       )
           Plaintiff,                  )
v.                                     )
                                       )      No. 3:05-0162
WALGREEN INCOME PROTECTION             )      JUDGE ECHOLS
PLAN FOR STORE MANAGERS and            )
METROPOLITAN LIFE INSURANCE            )
COMPANY,                               )
                                       )
           Defendants.                 )

<u>MEMORANDUM</u>

Pending before the Court are Defendants' Motion for Judgment on the Administrative Record (Docket Entry No. 38) and Plaintiff's Motion for Judgment on the Record (Docket Entry No. 40), to which the parties have responded in opposition. Plaintiff Carrie Platt brings this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, seeking judicial review of Metropolitan Life Insurance Company's decision to terminate her long-term disability benefits under the Walgreen Income Protection Plan for Store Managers ("the Plan").

## I. FACTS

**A. The Plan**

Plaintiff worked nearly five years as a store manager for the Walgreen Company ("Walgreens"). One of the benefits of her employment was a plan to protect income in the event of short-term or long-term disability. Under the Plan, Walgreens, the Plan

1

Administrator, is responsible to pay for any short-term disability benefits and the first six months of long-term disability benefits. Thereafter, long-term disability benefits are paid by Metropolitan Life Insurance Company ("MetLife"), which acts as Claim Administrator for the Plan. It is undisputed that the Plan vests discretionary authority in the Claim Administrator and the Plan Administrator to "construe and interpret the Plan and make benefit determinations, including claims and appeals determinations . . . as they deem appropriate in their sole discretion." (Docket Entry No. 7, Administrative Record ("AR"), Summary Plan Description ("SPD") at 0025.)

The Plan defines a long-term "disability" as follows:

After the first 6 months of disability, for the portion of your benefit called the Long-term disability period, "Disabled" or "Disability" mean that, due to sickness, pregnancy, or accidental injury, you are receiving appropriate care and treatment from a doctor on a continuing basis and

- for the next 18-month period you are unable to earn more than 80% of your Pre-disability Earnings or Indexed Pre-disability Earnings at your Own Occupation for any employer in your Local Economy; or

- after the first 24 months, you are unable to earn more than 60% of your Indexed Pre-disability Earnings from <u>any</u> employer in your Local Economy at <u>any</u> gainful occupation for which you are reasonably qualified, taking into account your training, education, experience, and Pre-disability Earnings.

(SPD at 0008-0009 (emphasis in original).) The Plan provides that, if a claim is denied, the claimant may pursue an appeal within 180

2

days of receiving the claim denial and the Claim Administrator or the Plan Administrator, as the case may be, will render a decision on the appeal within 45 days of receipt of the appeal. (SPD at 0024.)

## B. Plaintiff's Claim

### 1. Initial short-term and long-term disability decision

Plaintiff has a B.B.A. degree and a major in business administration earned in 1990. On May 20, 2002, at the age of 38, she ceased working for Walgreens. Around that time her attending physician, internist Dr. Mark Josovitz, diagnosed her with Parvovirus B19 infection based on laboratory test results showing that she was positive for the virus and that she had elevated levels of ALT, an enzyme found mainly in the liver. Dr. Josovitz described Plaintiff's debilitating fatigue, joint pain, and synovitis,[1] and stated that Plaintiff could not work. (AR 562-75, 577-78, 580, 583, 586.)

Based on Dr. Josovitz's Attending Physician Statement and the laboratory test results, MetLife approved Plaintiff's claim for short-term disability benefits through June 14, 2002. MetLife extended the benefits on several occasions. (AR 502, 540, 557, 581, 584, 587.)

---

[1]Synovitis is inflammation of connective tissue usually with pain and swelling of the joint.

3

MetLife referred the case for review to an independent physician consultant, Dr. Mark A. Moyer, a board-certified specialist in internal medicine and infectious diseases. (AR 558-59.) In a Physician Consultant Review dated August 15, 2002, he found Plaintiff's medical records described symptoms that were consistent with an acute Parvovirus B19 infection and a fairly recent onset of hypothyroidism, noting that "[e]ither of these conditions can be consistent with fatigue and Parvovirus can be associated with a prolonged recovery period associated with myalgias and arthralgias and even joint swelling." He further stated that, while prolonged recovery in adults is sometimes seen with Parvovirus infections, the records did not establish ongoing neuromuscular deficits, physical limitations or impairments that would preclude Plaintiff's return to work. He also noted that, while slight abnormalities of ALT level persisted, that in and of itself did not document disability. Dr. Moyer recommended gathering additional information from Plaintiff's physician and physical therapist to document any ongoing deficits or limitations that might support additional time off from work.

Following Dr. Moyer's report, Plaintiff submitted notes from her physical therapist (AR 533-39, 542-47) and office notes from Dr. Josovitz (AR 549-52). The physical therapy notes reflected that Plaintiff became fatigued easily and she reported pain in the lower extremities of 3-4 out of 10, with only "slow" progress being

4

made in the therapy program. (AR 533, 539, 542, 546.) Dr. Josovitz's notes indicated that Plaintiff had chronic fatigue syndrome limiting her participation in the work force to one to two hours per day and he stated "this is going to take some time to resolve." (AR 549, 551.) Based on these submissions, MetLife extended Plaintiff's short-term disability benefits through November 26, 2002. (AR 532.)

On October 8, 2002, MetLife advised Plaintiff that her short-term disability benefits would expire on November 26, and she should submit information to support a claim for long-term disability. (AR 472.) Plaintiff submitted a long-term disability statement dated October 18, 2002, in which she complained of pain in her legs, extreme fatigue, loss of concentration, sleep difficulties, and limited physical activity. (AR 476-483.) She indicated her activities of daily living consisted of caring for her one-year old daughter and performing certain household tasks, such as limited laundry, vacuuming, dusting, and washing dishes. She stated she did about ten percent (10%) of what she used to do and her husband handled many of the household chores, including grocery shopping and cooking. (AR 477, 479, 481-82.)

Further, Plaintiff indicated she would sweat and be out of breath after one-half to one hour of light housework. Ninety percent (90%) of the time she napped when her child napped. She had difficulty holding her child or carrying her very far.

5

Plaintiff was able to read, watch television, and use the computer occasionally. She reported being unable to fish, walk and swim as she did before her illness began. She reported leg pain at night that interfered with sleep, requiring the use of a heating pad and Tylenol or ibuprofen. Plaintiff reported her continuing symptoms were muscle pain in the legs, extreme fatigue, short-term memory loss and lack of concentration, sleep problems, depression, dizziness, night sweats and hot flashes and shortness of breath. Plaintiff stated her life had "significantly changed." (Id.)

Plaintiff submitted two statements from Dr. Josovitz. The first diagnosed Plaintiff with chronic fatigue syndrome secondary to Parvovirus infection. (AR 487-89.) Dr. Josovitz stated Plaintiff was capable of sitting eight hours per day and lifting up to twenty pounds occasionally, but she was not capable of performing her job duties due to fatigue, leg pain, lack of concentration, and tenderness in the upper extremities. In his second submission dated November 13, 2002, Dr. Josovitz indicated the diagnosis was chronic fatigue syndrome and Plaintiff had not been released to work in her own occupation because she was unable to be on her feet for more than three hours and because of tender thigh muscles and a tender lower back. (AR 455.) He noted, however, that Plaintiff was capable of performing other gainful employment, and that restricted job duties could begin "now." (AR 455-56.)

6

Plaintiff also submitted information dated October and November 2002 from Dr. Victor Gian, a consulting oncologist. (AR 460-64.) His records reflected essentially normal physical examinations, with an assessment of post-viral chronic fatigue syndrome and possible fibromyalgia[2] to account for Plaintiff's leg pain. (AR 462-64.) He stated he saw no clinical evidence of a malignancy or hematological problem. Dr. Gian indicated Plaintiff had no specific restrictions and limitations that prevented her from being able to perform her job duties, but he recommended a full autoimmune workup by a rheumatologist and, if that was normal, an evaluation by an infectious disease expert. (AR 460.)

A MetLife nurse consultant telephoned Plaintiff on November 14, 2002. (AR 17-18.) The interview confirmed that Plaintiff's activities of daily living consisted of caring for her child and performing limited household chores. Plaintiff stated her energy

---

[2] "There are no laboratory tests for the presence or severity of fibromyalgia." Sarchet v. Chater, 78 F.3d 305, 306 (7th Cir. 1996). The principal symptoms are pain all over, fatigue, disturbed sleep, stiffness and multiple tender spots in at least 11 of 18 fixed locations on the body. Id. The unavailability of objective clinical tests makes determination of the severity of the condition difficult. Id. at 307. "Some people may have such a severe case of fibromyalgia as to be totally disabled from working, . . . but most do not and the question is whether [plaintiff] is one of the minority." Id. See also Preston v. Secretary of Health and Human Servs., 854 F.2d 815, 819-20 (6th Cir. 1988) ("[F]ibrositis patients manifest normal muscle strength and neurological reactions and have a full range of motion[]"; the condition is diagnosed by the systematic elimination of other diagnoses, identification of focal tender points, and observation of other classic symptoms such as depression and sleep disturbance).

7

level was better, but she had pain in her arms and legs and difficulty sleeping. She reported she was borderline diabetic and had episodes of hypoglycemia. Plaintiff took medications for diabetes, hypothyroidism, and depression. Plaintiff indicated she could not return to work because she was too exhausted and her store manager position had been filled in her absence. Although Walgreens offered to place her in a temporary position until a store manager position opened, Plaintiff stated that she was not interested in returning unless she was placed in a store manager position. The nurse consultant recommended referring the file to an independent physician consultant to verify whether Plaintiff's activity level was in accordance with her symptoms and diagnosis.

The file was again sent to Dr. Moyer for review. (AR 446-48.) In a Physician Consultant Review dated November 15, 2002, he noted the additional documentation Plaintiff had submitted did not provide any new information beyond the records he had previously reviewed. Plaintiff's continued physical symptoms were consistent with a diagnosis of chronic fatigue syndrome due to Parvovirus infection, but Plaintiff's subjective complaints of poor concentration and memory were not borne out by the record. He stated neuropsychological testing would be needed to substantiate any cognitive deficit. He also observed that, while patients suffering from Parvovirus infection can remain fatigued for many months, Plaintiff had remained fatigued for one year. He found the

8

complaints of fatigue, weakness and overall physical impairment "somewhat supported" by the observations of the physical therapist, although Plaintiff reported some social activity and caring for her child. He suggested direct observation of her behaviors to document her activity or a functional capacity evaluation. Additional workup, functional testing, and neuropsychological testing would be needed to document Platt's functional capacity. He believed that Plaintiff's medical records, particularly the Attending Physician Statement submitted by Dr. Josovitz, would support a return to a sedentary level occupation. In his view, return to Plaintiff's more demanding previous job, which was medium to heavy with stressful episodes and long hours, would not be possible at that time based on the records provided. Following Dr. Moyer's second review, MetLife approved Plaintiff's long-term disability claim on December 2, 2002.[3] (AR 444.)

2. *Transitional review of long-term disability*

Beginning in October 2003, MetLife began a transitional review of Plaintiff's claim to determine whether, after the passage of 24 months, she would be unable to earn sixty percent (60%) of her pre-disability earnings in any gainful occupation, rather than eighty percent (80%) of the earnings from her own occupation, as the Plan

---

[3]Plaintiff applied for Social Security disability benefits in January 2003, but her claim was denied. (AR 440, 423-26.) Plaintiff pursued the reconsideration process, including a hearing before an Administrative Law Judge, but her claim was finally denied on August 11, 2003. (AR 356-358, 362-63, 392.)

required.   (AR 352.)   As requested, Plaintiff submitted an Activities of Daily Living questionnaire, in which she described daily chronic pain in her legs; chronic pain in her arms, shoulders, back, hips, hands and feet; memory problems; and confusion.  (AR 336-43.)  She stated her daily routine involved caring for her two-year old daughter and doing housework when she was able.  Plaintiff explained she could accomplish only a task or two at a time, such as ironing one pair of pants a day, and it took her two weeks to clean her five-room home.   She indicated difficulty handling her own personal care needs and was limited in driving.  On the advice of a nurse she purchased a whirlpool/spa, which she used one to five times daily for pain relief.   She attended church on Sunday once a month and on Monday, if able, took her child to a play group for three hours from 10 a.m. to 1 p.m.

Plaintiff submitted an Attending Physician Statement from Dr. Tanzi Dooley, who is board certified in Internal Medicine and a co-practitioner of Dr. Josovitz.  (AR 344-46.)  Dr. Dooley provided a primary diagnosis of fibromyalgia with secondary chronic fatigue, anxiety, depression, and insomnia.   Dr. Dooley identified Plaintiff's restrictions as sitting for three hours, standing for two hours and walking for one hour, all intermittently.  Plaintiff was found to be unable to climb, twist, bend, stoop or reach above shoulder level.  She could operate a motor vehicle and occasionally lift up to twenty pounds.  According to Dr. Dooley, Plaintiff was

10

unable to work because she could not sit, stand or walk for any length of time, and because she had generalized muscle weakness all over with chronic pain.

Dr. Dooley's office notes began in early 2003. (AR 393-415.) These notes referred to Plaintiff's history of fibromyalgia with complaints of generalized joint pain, fatigue, and depression as well as her significant stress related to the adoption of her daughter. Laboratory tests were conducted and medications for pain, sleep and depression were adjusted. (AR 296-302.)

Plaintiff also submitted two office notes from Dr. Eli Steigelfest, a board-certified internist and rheumatologist. (AR 271-74.) On December 1, 2003, he evaluated Plaintiff for complaints of diffuse myalgias, arthralgias and positive ANA (an antibody, elevated levels of which may reflect an autoimmune disorder). His review of Plaintiff's systems was positive for numbness, tingling, muscle pain, weakness, depression and anxiety, although Plaintiff appeared to be in "mild distress." (AR 271.) Plaintiff had good range of motion in the cervical spine and no synovitis following a full examination of the upper extremities. (AR 272.) His impression was that Plaintiff had "myalgias, arthralgias most likely fibromyalgia etiology." He indicated he wanted to make sure there were no residual findings of Parvovirus, and he stressed an anaerobic-type exercise program "more than anything else." He believed pain medication "might be a reasonable

11

option." His notes do not indicate that he assessed Plaintiff's functional capacity.

In a follow-up examination on December 11, 2003, Dr. Steigelfest noted Plaintiff was functioning overall and appeared to be in "minimal distress." (AR 273.) A musculoskeletal examination revealed 10 out of 18 positive tender points. His impression was that Plaintiff had an elevated ANA level and fibromyalgia. He provided Plaintiff education concerning fibromyalgia, recommended conservative measures, and encouraged Plaintiff to continue an exercise program to assist with depression. (AR 273-74.)

MetLife referred the file to Dr. Janet Collins, who is board-certified in Occupational and Environmental Medicine. (AR 260-67.) In a Physician Consultant Review dated February 23, 2004, Dr. Collins found there was "no objective data in the available medical records to support the existence of a physical impairment which could be considered totally disabling as is the contention of Dr. Dooley[.]" (AR 266.) Dr. Collins noted that Plaintiff had ongoing complaints of myalgias, arthralgias, insomnia and fatigue dating back nearly two years, but she stated: "Work up during that time has been entirely appropriate and has failed to reveal any significant physical pathology to account for the ongoing symptoms constellation." (AR 266.) Dr. Collins observed Plaintiff continued to care for a two-year old child, was able to write long notes regarding her medical condition displaying very good

12

recollection of detail, and had been able to attend multiple office visits by treating physicians over the two-year period. She further noted Dr. Steigelfest had encouraged Plaintiff to increase her level of physical activity. Dr. Collins opined that Plaintiff "should be able to perform the essential functions of most jobs in the sedentary and light category and perhaps even into the medium category of work." (AR 266.)

In response to Dr. Collins' report, Dr. Dooley provided a letter dated April 1, 2004, disputing as "probably exaggerated" the "consultant's opinion that attending office visits or writing notes to a physician to document symptoms proves this patient does not need disability[.]" Dr. Dooley indicated depression and anxiety should "most certainly be considered[.]" She further stated the "consultant's view that light sedentary work should be attempted is not unreasonable. However, due to the fluctuating symptoms of fibromyalgia, this may be difficult for this patient." (AR 133.)

MetLife then referred Plaintiff's claim for an Employability Assessment by a Vocational Rehabilitation Consultant, Allen R. Searles. (AR 243-44.) He found Plaintiff had the ability to work at a sedentary job, and identified four occupations paying as much or more than Plaintiff's prior job, for which she was qualified based on her training, education, and experience. These occupations included: (1) Manager, Department Store; (2) Manager, Merchandise; (3) Director, Service; and (4) Hospital-Insurance

13

representative. (AR 244.) Potential employers for these occupations were found to exist in Plaintiff's geographical area.

MetLife terminated Plaintiff's long-term disability benefits by letter dated April 26, 2004. (AR 252-54.) MetLife identified the medical evidence Plaintiff submitted and indicated the file had been reviewed by an independent physician consultant. MetLife stated the available medical records contained no objective data to support functional impairment to support total disability from any occupation. MetLife further stated that Plaintiff was capable of performing sedentary to light jobs "based on information from Dr. Dooley." (AR 253.) Because jobs for which Plaintiff was qualified existed in the local economy, MetLife denied Plaintiff's claim effective May 19, 2004.

### 3. Plaintiff's Administrative Appeal

Plaintiff appealed MetLife's decision in a letter dated May 12, 2004, in which she set forth extensive examples of her continuing inability to function. (AR 246-49.) She also submitted a June 1, 2004 letter written by Dr. Dooley. (AR 238.) Dr. Dooley found it "astounding that major depression in this patient is not considered a valid diagnosis for disability." She also found it "very unreasonable to believe a patient is not disabled because she/he can write a letter to his/her physician stating their medical concerns." Dr. Dooley continued, "The physician making this decision has not taken into account that these letters were

14

written over a period of days to weeks due to the patient's chronic pain or fatigue." She observed that the "potential employment options appear to be very similar to jobs the patient previously worked and was unable to do because of her symptoms." She opined that Plaintiff "is still not able to perform any type of job[,]" and urged MetLife to continue Plaintiff's long-term disability benefits.

MetLife referred the file to Dr. Valerie Ito for a fourth Physician Consultant Review. (AR 224-33.) In a report dated June 1, 2004, Dr. Ito noted that Plaintiff's complaints of ongoing fatigue, pain and memory difficulties were all subjective in nature. (AR 232.) She noted the medical records lacked documentation of formal testing to identify any cognitive dysfunction. Dr. Ito determined that Plaintiff had the capacity to function at the level of sedentary or light work. (AR 232-33.) Thus, MetLife upheld its determination on appeal by letter dated June 18, 2004, citing the findings of Dr. Ito. (AR 234-36.) MetLife informed Plaintiff she had exhausted her administrative remedies under the Plan and no further appeals would be considered.

Plaintiff retained an attorney, who submitted additional medical documentation and a vocational evaluation report within 180 days after Plaintiff's receipt of MetLife's letter denying long-term disability benefits. (AR 51-67, 70-159.) Because MetLife

15

refused to consider the new information, it is technically not part of the administrative record before the Court.

For purposes of identification only, this submission included additional medical records from Dr. Gian dated October 2002 and August 2003. He found no abnormalities upon physical examination on August 11, 2003 and stated that Plaintiff denied bone pain, myalgias, arthralgias or limited range of motion. He again urged her to see a rheumatologist, which Plaintiff did when she visited Dr. Steigelfest in December 2003. (AR 74-75.)

Plaintiff also submitted an October 4, 2004 fibromyalgia "questionnare" sent by her counsel to Dr. Steigelfest, who checked "yes" when asked if Plaintiff met the American College of Rheumatology ("ACR") criteria for fibromyalgia. She submitted a follow-up medical record of an office visit with Dr. Steigelfest on July 9, 2004, which noted Plaintiff was in "minimal distress," her examination was essentially normal except for positive tender points of 14 out of 18, Plaintiff continued to complain of sleep problems, and the primary diagnosis was fibromyalgia. (AR 82.) Plaintiff provided MetLife with Dr. Steigelfest's curriculum vitae. (AR 93-94.)

In a sworn statement taken by Plaintiff's counsel on September 10, 2004, Dr. Dooley confirmed that Plaintiff's symptoms are very consistent with fibromyalgia and that she meets or surpasses the ACR criteria for fibromyalgia: trigger points, extreme fatigue,

16

and disorganized, disregulated sleep patterns. (AR 100.) Dr. Dooley testified that the disease process varies so much that there is not any way to measure objectively the patient's restrictions and limitations on a daily basis. (AR 101.) She explained the condition causes Plaintiff to have difficulty with movement and general daily activities. She is able to do minimal activity at any given time and often experiences severe pain associated with activity. Mood and pain components are part of the disease, which has no cure. Symptoms vary quite a bit over time. The disease can be extremely painful and debilitating, and at other times it can be a little more manageable. (AR 98.) Primary treatment is supportive, making sure the patient gets organized, regulated sleep and a good sleep pattern. This involves use of prescription medication with a chemical called serotonin which can help regulate pain. Some type of physical activity is recommended because studies have shown disability is lessened in the future if some minimal activity is maintained. (AR 98.) Dr. Dooley reported Plaintiff also suffers from diabetes, hypertension, high cholesterol and hypothyroidism which are treated medically. (AR 99.) Dr. Dooley denied that Plaintiff is a malingerer or one who exaggerates her symptoms and stated she believes Plaintiff's report of her symptoms is true. (AR 102.) Although Plaintiff's symptoms are better at times, Plaintiff is not able to work on a sustained basis. (AR 104-105.) During an eight-hour work day, Plaintiff

would be able to sit only for short periods and she would need bed rest of four to six hours. (AR 105.) Dr. Dooley disagreed with MetLife's consulting physicians that Plaintiff could do sedentary or light work. (AR 106-108.) In her view, Plaintiff should be considered totally disabled and unable to engage in any occupation. (AR 110.) Plaintiff provided MetLife with Dr. Dooley's curriculum vitae and medical records of office visits dated August 29, 2003 to September 14, 2004. (AR 112-114, 115-122.)

Plaintiff also submitted an October 15, 2004 report from a vocational expert, Mark Boatner. (AR 53-61.) He reviewed Dr. Dooley's Medical Opinion Form dated July 8, 2004, Dr. Dooley's sworn statement taken September 10, 2004, and Dr. Steigelfest's positive response to the single question posed by counsel whether Plaintiff met the ACR criteria for fibromyalgia. Relying on the Dictionary of Occupational Titles (DOT), Boatner concluded that Plaintiff does not retain the residual functional capacity for sustained full- or part-time work at any level of strength or skill. (AR 61.) Taking as true Dr. Dooley's portrayal of Plaintiff's limitations and restrictions, Boatner opined to a reasonable degree of vocational rehabilitation certainty that Plaintiff "does not possess the minimum functional ability for any type of job or occupation listed in the DOT or performed in the national economy." (AR 61.)

By letter dated November 3, 2004, MetLife responded to Plaintiff's counsel that Plaintiff had already exhausted her administrative remedies under the Plan and it declined to consider any additional documentation in support of an appeal. (AR 50.) This suit followed.

## II.  STANDARD OF REVIEW

The parties agree that the Plan gives MetLife discretionary authority to determine eligibility for benefits. As a result, this Court must apply the highly deferential "arbitrary and capricious" standard of review. <u>Firestone Tire and Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989); <u>Killian v. Healthsource Provident Administrators, Inc.</u>, 152 F.3d 514, 520 (6th Cir. 1998). This standard is the least demanding form of judicial review of administrative action, and MetLife's decision to terminate Plaintiff's long-term disability benefits must "be upheld if it is the result of a deliberate principled reasoning process, and if it is supported by substantial evidence." <u>Baker v. United Mine Workers of American Health & Retirement Funds</u>, 929 F.2d 1140, 1144 (6th Cir. 1991).

A decision is not arbitrary or capricious if it is rational in light of the Plan's provisions. <u>Yeager v. Reliance Standard Life Ins. Co.</u>, 88 F.3d 376, 381 (6th Cir. 1996). The "arbitrary and capricious" standard of review "is not, however, without some teeth." <u>McDonald v. Western-Southern Life Ins. Co.</u>, 347 F.3d 161,

19

172 (6th Cir. 2003).  Deferential review does not mean no review,
and deference need not be abject.  Id.  A decision may be arbitrary
or capricious if it lacks substantial evidence, reveals a mistake
of law, or is made in bad faith.  Caldwell v. Life Ins. Co. of
North America, 287 F.3d 1276, 1282 (10th Cir. 2002).  Application
of the standard must take into account any conflicts of interest
held by the decision-maker and its consultants because there may be
a natural reluctance on the decision-maker's part to award benefits
where those benefits would be paid out of the decision-maker's own
assets.  Bruch, 489 U.S. at 115; Killian, 152 F.3d at 521.  The
Court is obligated to review the quality and quantity of the
medical evidence and opinions on both sides of the issue, McDonald,
347 F.3d at 172; however, the Court is confined to the record that
was before the Claims Administrator.  Wilkins v. Baptist Healthcare
Sys., Inc., 150 F.3d 609, 615 (6th Cir. 1998).

### III.  ANALYSIS

MetLife contends its decision to terminate Plaintiff's long-
term disability benefits should be upheld as rational, and not
arbitrary or capricious, in light of the Plan's provisions.
MetLife admits "the administrative record contains adequate
evidence to support a diagnosis of fibromyalgia and/or chronic
fatigue syndrome." (Docket Entry No. 39 at 12.) The record lacks,
according to MetLife, any objective indicators that this medical
condition precludes Plaintiff from engaging in "any gainful

20

occupation." (SPD 0009.) <u>See Pralutsky v. Metropolitan Life Ins.</u> <u>Co.</u>, 435 F.3d 833, 839-840 (8th Cir. 2006) (upholding MetLife's decision to deny benefits in fibromyalgia case where claimant failed to provide objective evidence to establish severity of her condition rendering her unable to work at any job).

MetLife points to the determination of treating physician Dr. Josovitz in November 2002 that Plaintiff was capable of other gainful employment, and it observes the record does not explain why or how Plaintiff's position changed such that she could do no gainful work when MetLife undertook its transitional review in 2003. MetLife recognizes Dr. Dooley stated in early 2003 that Plaintiff's symptoms were "more consistent" with fibromyalgia and Dr. Dooley adjusted Plaintiff's medications several times that summer, but MetLife suggests that Dr. Dooley's records offer no indication or explanation, especially any objective findings, that the nature of Plaintiff's impairment had changed precluding her from performing any gainful employment.

MetLife relies on <u>Yeager v. Reliance Standard Life Ins. Co.</u>, 88 F.3d 376 (6th Cir. 1996) and <u>Bucks v. Reliance Standard Life</u> <u>Ins. Co.</u>, 215 F.3d 1325, 2000 WL 659029 (6th Cir. 2000) (unpublished). In both cases, the Sixth Circuit observed that some objective evidence of disability is necessary because "subjective complaints are easy to make, but almost impossible to refute." <u>Yeager</u>, 88 F.3d at 382; <u>Bucks</u>, 2000 WL 659029 at *4. Neither case

21

is apposite here. In <u>Yeager</u> "no doctor ever actually definitively diagnosed plaintiff as having" fibromyalgia, and without some objective evidence resulting in such a diagnosis, the Plan did not act arbitrarily and capriciously in denying benefits. <u>Yeager</u>, 88 F.3d at 381-382. Yet here, treating physicians Dr. Dooley and Dr. Steigelfest both opined that their clinical examinations of Plaintiff revealed she met the ACR criteria for fibromyalgia.

In <u>Bucks</u> the claimant complained of disabling headaches and depression, and in such a situation, the Sixth Circuit ruled the Plan Administrator did not act arbitrarily and capriciously when it required objective documentation of a mental disability causing total disability, particularly where the claimant had worked for years with the same conditions. <u>Bucks</u>, 2000 WL 659029 at *4. In this case, Plaintiff stopped working at Walgreens due to Parvovirus infection and then due to chronic fatigue syndrome and fibromyalgia. She has not returned to employment at any time.

Thus, the case reduces to whether MetLife acted arbitrarily and capriciously in terminating long-term disability benefits where the opinion of one of Plaintiff's four treating physicians (Dr. Dooley) supported fibromyalgia so severe as to result in total disability, but the opinions of MetLife's consulting physicians (Drs. Collins and Ito) did not. In considering this matter, the Court must keep in mind MetLife's conflict of interest in its roles as both Claim Administrator and benefit provider, as well as the

conflict of interest of MetLife's consulting physicians, whom MetLife retained and paid to review Plaintiff's file. <u>See</u> <u>Calvert v. Firstar Finance, Inc.</u>, 409 F.3d 286, 292 (6th Cir. 2005) (noting claims administrator had clear incentive to contract with individuals who were inclined to find in its favor that claimant was not entitled to long-term disability benefits, especially because claimant was young and paying long-term benefits would be expensive).

In <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 825 (2003), the Supreme Court held that MetLife, as Claims Administrator, was "not obliged to accord special deference to the opinions of treating physicians." The Court also ruled that neither ERISA nor the Secretary's regulations imposed "a heightened burden of explanation on administrators when they reject a treating physician's opinion." <u>Id.</u> at 831. The Supreme Court made clear, however, that the Claims Administrator may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician. <u>Id.</u> at 834; <u>Smith v. Continental Cas. Co.</u>, 450 F.3d 253, 262 (6th Cir. 2006). And the consulting physicians hired by the Claims Administrator to review the file may not make credibility determinations concerning the claimant's subjective complaints without the benefit of a physical examination. <u>Smith</u>, 450 F.3d at 263.

23

Although a close question is presented, the Court concludes that MetLife acted arbitrarily and capriciously when it made the decision to terminate long-term disability benefits. The administrative record clearly confirmed, as MetLife admits, that Plaintiff suffers from fibromyalgia. Dr. Dooley, Plaintiff's treating physician, opined that Plaintiff was totally disabled and unable to work at any job in the local economy because of her need for extensive bed rest, her debilitating pain, depression, and extensive limitations on sitting, standing, walking, twisting, bending, and stooping, especially for prolonged periods of time. Dr. Dooley believed Plaintiff could not handle even a sedentary job, let alone her prior medium to heavy job or any of the four jobs similar to Plaintiff's store manager position that MetLife's vocational expert suggested Plaintiff could perform. When asked to comment on Dr. Collins' consulting review, Dr. Dooley responded that Dr. Collins had not taken into account Plaintiff's depression and had unfairly determined that Plaintiff's ability to write notes to her doctors about her medical condition showed that she was not totally disabled.

Under <u>Nord</u>, MetLife was not required to give deference to Dr. Dooley's opinion over the opinions of its own consulting physicians. But MetLife's consultants were not free to discredit Plaintiff's subjective complaints of pain or its impact on her physical capacity without a physical examination. See <u>Smith</u>, 450

24

F.3d at 262-263.  In her Physician Consultant Review, Dr. Ito agreed with Dr. Collins that Plaintiff retained ongoing capacity to function within a sedentary or light capacity.  (AR 224-233.)  Yet the tone of Dr. Ito's report suggests she may well have decided that Plaintiff's subjective complaints were not to be believed:

> Throughout the time course of her impairment she has been able to care for her 1 to 2-year-old daughter including getting up one to two times nightly to meet her needs. She tends to household chores on an as needed basis including vacuuming, laundry and at least daily dishes. She takes her daughter to play groups on a regular basis, lasting three hours in duration.  She has attended physical therapy sessions one to three times a week also. Though she indicates she drops her fork, has dropped glasses and has difficulty opening jars, this has not kept her from carrying her child or picking the child up or impaired her from changing the child's diapers.  She also indicates she has difficulty gripping the steering wheel and 75% of the time cannot step on the brake pedal well, yet she continues to drive.  It appears she does what [she] "needs or wants to do" when she needs to or wants to do activities.  This is in distinction to a true ongoing impairment.

(AR 232.)

If MetLife was unpersuaded by Plaintiff's or Dr. Dooley's descriptions of Plaintiff's limitations, MetLife had the discretion, in accordance with the Plan terms, to require Plaintiff to submit to an independent medical examination, which could have included an assessment of her functional capacity.  Indeed, in late 2002 Dr. Moyer, MetLife's own consulting physician, suggested direct observation of Plaintiff's behaviors to document her activity or a functional capacity evaluation.  He also stated that additional workup, functional testing, and neuropsychological

25

testing would be needed to document Plaintiff's functional capacity.

In response to Dr. Moyer's report, MetLife granted Plaintiff's claim for long-term disability benefits, and then in early 2003 hired Omega Insurance Services to conduct surveillance at Plaintiff's home to observe her behavior. (AR 588-594.) The investigator was able to see Plaintiff outside of her home for only a short time, and the encounter did not reveal significant information about her physical abilities. The record contains no indication that MetLife followed up on Dr. Moyer's suggestion to conduct a functional capacity evaluation.

While MetLife's reliance on file reviews by Dr. Moyer, Dr. Collins, and Dr. Ito does not, standing alone, require the conclusion that MetLife acted improperly, "the failure to conduct a physical examination--especially where the right to do so is specifically reserved in the plan--may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." Calvert, 409 F.3d at 295. "Whether a doctor has physically examined the claimant is indeed one factor that [this Court] may consider in determining whether a plan administrator acted arbitrarily and capriciously in giving greater weight to the opinion of its consulting physician." Kalish v. Liberty Mut./Liberty Life Assur. Co., 419 F.3d 501, 508 (6th Cir. 2005). See also McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161,

26

163-164 (6th Cir. 2003) (where medical consultants believed some of claimant's activities were inconsistent with diagnosis of major depression, Western-Southern asked claimant to submit to independent medical examination to determine if he remained eligible for long-term disability benefits).

MetLife points out that Plaintiff's doctors did not conduct any functional, neuropsychological or other testing to document a deterioration in her functional capacity, noting Dr. Moyer's recommendation for such functional capacity testing if Plaintiff continued to complain of fatigue, relying on Bucks, 2000 WL 659029 at *5 (the "burden of showing disability and supporting [the] claim" is on the claimant). First, it seems clear from Dr. Moyer's report that he recommended *MetLife* should request a functional capacity evaluation if Plaintiff continued to complain of pain. Second, in Bucks the Sixth Circuit found it "strange" that the Plan Administrator did not ask Bucks to submit to an examination or interview with its medical experts. 2000 WL 659029 at *5.

Similarly in this case the Court questions why MetLife did not ask Plaintiff to participate in an independent medical examination and/or a functional capacity evaluation. The express terms of the Plan provided that "[y]ou may be required to submit to an independent medical examination (IME) and . . . [i]f you refuse to complete a requested IME . . . disability benefits will cease." (SPD 0009.) An independent medical examination or functional

27

capacity evaluation may have provided helpful information to persuade MetLife to continue or discontinue Plaintiff's long-term disability benefits. Thus, on the facts of this case the Court concludes that MetLife's failure to request an independent medical examination and/or functional capacity evaluation, when its own consulting physician suggested such an approach, supports the conclusion that MetLife's decision to deny benefits was arbitrary and capricious, particularly when MetLife's conflict of interest is taken into account. See Smith, 450 F.3d at 262-263; Calvert, 409 F.3d at 296. Cf. Henderson v. Ameritech Corp., 2001 WL 1823813 at *7 (6th Cir. 2001) (unpublished) (given weakness of plaintiff's evidence, Ameritech did not act in arbitrary and capricious manner when it gave more weight to report of its independent medical examiner). Moreover, MetLife did not produce any evidence of Plaintiff's medical improvement to justify terminating long-term disability benefits she had already been awarded. See McOsker v. Paul Revere Life Ins. Co., 279 F.3d 586, 590 (8th Cir. 2002). The Court concludes that the case should be remanded to MetLife for a full and fair review of Plaintiff's disability claim. See Smith, 450 F.3d at 265.

Because the Court determines that a remand in Plaintiff's favor is appropriate, the Court need not reach Plaintiff's additional arguments that MetLife failed to provide a full and fair review of Plaintiff's disability claim when it issued an allegedly

28

misleading denial letter and refused to consider the additional evidence Plaintiff proffered in October 2004 as part of her appeal. (Docket Entry No. 41, Brief at 13-17.)

## IV. CONCLUSION

For all of the reasons stated, the Court determines that Defendants' Motion for Judgment on the Administrative Record (Docket Entry No. 38) will be DENIED and Plaintiff's Motion for Judgment on the Record (Docket Entry No. 40) will be GRANTED IN PART AND DENIED IN PART. The Court will not grant benefits in Plaintiff's favor, but the Court will remand the case to MetLife for reconsideration and a full and fair review in light of this opinion.

An appropriate Order shall be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE